# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JOHN MARKS, ) | |
| ) | Case No. 16-cv-8656 |
| Plaintiff, ) | |
| ) | Judge Robert M. Dow, Jr. |
| v. ) | |
| ) | |
| WORLDWIDE ROBOTIC AUTOMATED ) | |
| PARKING, LLC, DONALD JAGODA, and ) | |
| 5BY2 B.V., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff John Marks brings suit against Defendants 5BY2 B.V. ("5BY2"), Worldwide Robotic Automated Parking, LLC ("WRAP"), and Donald Jagoda alleging breach of contract, unjust enrichment, and tortious interference with prospective economic advantage. Currently before the Court is Plaintiff's motion to conduct jurisdictional discovery regarding the Court's personal jurisdiction over 5BY2 [43]. For the reasons set forth below, the Court denies Plaintiff's motion to conduct jurisdictional discovery [43]. Plaintiff is given until August 3, 2017 to file a response brief to Defendant 5BY2's motion to dismiss for lack of personal jurisdiction [19]; Defendant 5BY2 is given until August 17, 2017 to file a reply brief. The Court will issue a ruling by mail.

## I. Background

At the center of this dispute is a sales agency agreement ("SAA") between Defendant 5BY2 and Defendant WRAP. 5BY2 is a Dutch company that manufactures automated parking systems, and WRAP is a Michigan company that is in the business of marketing such systems. In November 2014, 5BY2 and WRAP entered into a SAA whereby WRAP would serve as the

exclusive sales agent of 5BY2 in the United States, Mexico, the Dominican Republic, and Puerto Rico for a five-year period. [1, at ¶¶ 1, 19.] In exchange for WRAP's services as sales agent, 5BY2 agreed to pay WRAP commissions on all products sold to customers resulting from orders procured by WRAP, as well as other commissions and referral fees. [*Id.* at ¶ 20.]

Plaintiff, a resident of Florida, contends that in November 2014, WRAP arranged for Plaintiff to meet with 5BY2 representatives in Chicago to discuss Plaintiff's potential financing of WRAP's promotion and marketing of 5BY2 parking systems under the SAA.[1] [*Id.*, at ¶ 2.] Plaintiff asserts that on January 2, 2015, Plaintiff, WRAP, and WRAP's principal, Defendant Donald Jagoda, entered into a Funding Agreement, a collateral assignment of contracts, and a promissory note and security agreement, by which Plaintiff would provide funding to WRAP and Jagoda to support WRAP's promotion and marketing of 5BY2's parking systems. [*Id.*, at ¶¶ 3, 24.] Plaintiff alleges that the Funding Agreement also provides that Plaintiff would receive royalty payments of 25% of the commission or other payments that WRAP and Jagoda received as a result of any sales under the SAA. [*Id.*, at ¶ 25.] Plaintiff asserts that as security for the Funding Agreement, WRAP and Jagoda provided Plaintiff with a $200,000 promissory note and a security agreement, pursuant to which WRAP collaterally assigned and conveyed to Plaintiff "all rights to payment under or related to the SAA." According to Plaintiff, the Funding Agreement was negotiated in part in this district and provides that this district shall be the forum for resolving controversies under the agreement. Plaintiff contends that the parties executed a separate Collateral Assignment of Contracts and Power of Attorney, dated January 2, 2015, confirming the assignment of rights under the SAA to Plaintiff. [*Id.*, at ¶ 29.] Plaintiff asserts

---

[1] Defendant 5BY2 asserts that this meeting actually took place in November 2015. The date of this meeting does not affect the Court's analysis.

that he made an initial advance of $15,400 to WRAP and Jagoda and provided monthly funding to WRAP and Jagoda pursuant to the Funding Agreement. [*Id.*, at ¶ 26.]

Plaintiff contends that by April 2016, WRAP and Jagoda had defaulted on the $200,000 promissory note and Funding Agreement. [*Id.* at ¶ 32.] Plaintiff further contends that in breach of the Funding Agreement, WRAP and Jagoda failed to pay amounts due to Plaintiff, including royalty payments. [*Id.* at ¶ 33.] Plaintiff alleges upon information and belief that from November 2014 through April 2015, WRAP received commission payments from 5BY2 totaling approximately $133,970 pursuant to the SAA. [*Id.* at ¶ 32.] On April 4, 2016, Plaintiff sent a notice of default and demand for payment to WRAP and Jagoda and a letter to 5BY2 indicating that Plaintiff was a secured creditor of WRAP and that all further payments with respect to the SAA should be made to Plaintiff because of WRAP and Jagoda's default. [*Id.* at ¶¶ 35–36.]

Plaintiff alleges upon information and belief that during this same period of time, WRAP and 5BY2 were negotiating the terms of an agreement to end their relationship. [*Id.* at ¶ 37.] On April 7, 2016, WRAP and 5BY2 entered into an early termination agreement terminating the SAA ("the Termination Agreement"). Under the Termination Agreement, 5BY2 agreed to pay WRAP $450,000 over a period of approximately eight months. [*Id.* at ¶¶ 38–39.] Plaintiff contends that on April 11, 2016, 5BY2 paid WRAP $210,000 in accordance with the payment schedule set forth in the Termination Agreement, and the funds were deposited into an escrow account. [*Id.* at ¶ 40.] Plaintiff contends that he learned about the Termination Agreement shortly after it was executed. [*Id.* at ¶ 41.] Plaintiff asserts that on April 13, 2016, with the consent of WRAP, he again wrote to 5BY2 and advised that any monies owed to WRAP under the SAA or Termination Agreement should be preserved until the issues could be resolved. [*Id.* at ¶ 10, 42.]

In late April 2016, 5BY2 claimed that the SAA prohibited WRAP's Collateral Assignment of rights under the SAA to Plaintiff. 5BY2 claimed that upon WRAP's Collateral Assignment, the SAA became terminable at the option of 5BY2, and thus 5BY2 was terminating the SAA retroactively, effective January 2, 2015, the date of the Collateral Assignment to Plaintiff. [*Id.* at ¶ 43.] Plaintiff alleges that 5BY2 also claimed that WRAP fraudulently induced 5BY2 to enter into the Termination Agreement because WRAP had collaterally assigned its rights to Plaintiff and had not obtained Plaintiff's consent to enter into the Termination Agreement. 5BY2 allegedly asserted that had it known about the Collateral Agreement, it could have terminated the SAA without penalty or any other form of payment obligation. 5BY2 allegedly claimed that the Termination Agreement was therefore void. [*Id.* at ¶ 44.] Plaintiff alleges, however, that he gave his consent to enter into the Termination Agreement, that the Collateral Agreement was not a prohibited assignment under the SAA, and that nothing in the SAA allows a party to retroactively terminate the agreement. Thus, in Plaintiff's view, 5BY2's retroactive termination of the SAA and its repudiation of its obligation under the Termination Agreement were improper. [*Id.* at ¶¶ 43, 45.] Plaintiff contends that 5BY2 is refusing to pay any further amounts it owes to WRAP under the Termination Agreement and is seeking through arbitration the $210,000 it paid to WRAP under the Termination Agreement, as well as the $133,970.44 in commission that it paid to WRAP under the SAA since January 2, 2015. [*Id.* at ¶ 46.]

Plaintiff contends that since WRAP and 5BY2 entered into the Termination Agreement, 5BY2 has benefited from numerous sales resulting from the sales leads that WRAP identified and developed from funds provided by Plaintiff. Plaintiff alleges upon information and belief that these sales total in excess of $2,000,000. [*Id.* at ¶ 47.] Plaintiff asserts that as of July 31,

2016, Plaintiff has advanced over $280,000 to WRAP and Jagoda for 5BY2 marketing activities and that only a portion of this funding has been repaid. [*Id.* at ¶ 49.]

Plaintiff brought suit against Defendants WRAP, 5BY2, and Jagoda on September 2, 2016. In Count I (against all Defendants), Plaintiff seeks a declaration that the SAA was not terminable upon collateral assignment and that the Termination Agreement is not void. In Count II, Plaintiff brings a breach of funding agreement and promissory note claim against WRAP and Jagoda. In Count III, which is pled in the alternative to Count I, Plaintiff brings an unjust enrichment claim against 5BY2. In Count IV, Plaintiff asserts a tortious interference with prospective economic advantage claim against 5BY2.

5BY2 filed a 12(b)(2) motion to dismiss for lack of personal jurisdiction [19]. According to the declaration of Kamiel Koot, 5BY2's director and CEO, 5BY2 is incorporated in the Netherlands, has its principal place of business in the Netherlands, does not conduct corporate operations in Illinois, does not maintain an office in Illinois, does not own, hold, use, possess, or lease any real or personal property in Illinois, has no employees in Illinois, is not registered to do business in Illinois, does not sell products, advertise, or solicit business in Illinois, has never executed a contract in Illinois, is not party to any contract with an Illinois resident, and has never consummated a business transaction in Illinois. [19, Exhibit B, at ¶¶ 19–31.] Plaintiff filed a motion to conduct jurisdictional discovery [43], which is currently before the Court. Plaintiff argues that he has established a *prima facie* case of general jurisdiction such that the Court should grant him leave to take jurisdictional discovery. 5BY2 also filed a 12(b)(6) motion to dismiss for failure to state a claim [21], which the Court entered and continued. [See 31.]

## II. Legal Standard

A plaintiff does not have an automatic right to jurisdictional discovery in every case. *Gilman Opco LLC v. Lanman Oil Co., Inc.*, 2014 WL 1284499, at *6 (N.D. Ill. Mar. 28, 2014). Rather, "it is within the discretion of the district court to allow a plaintiff to conduct limited discovery in order to establish that jurisdiction exists." *Sanderson v. Spectrum Labs, Inc.*, 248 F.3d 1159 (7th Cir. 2000). The plaintiff must establish a colorable or *prima facie* showing of personal jurisdiction before discovery is permitted. *Indag GmbH & Co. v. IMA S.P.A*, 150 F. Supp. 3d 946, 971 (N.D. Ill. 2015). In other words, the plaintiff must advance "proof to a reasonable probability" of the facts necessary to establish personal jurisdiction. *Pentwater Equity Opps. Master Fund, Ltd. v. Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.*, 2016 WL 6476541, at *1 (N.D. Ill. Nov. 2, 2016) (quoting *Anthony v. Sec. Pac. Fin. Servs., Inc.*, 75 F.3d 311, 316 (7th Cir. 1996)) (internal quotation marks omitted). Courts generally will grant jurisdictional discovery if the plaintiff "can show that the factual record is at least ambiguous or unclear on the jurisdictional issue." *Gilman Opco LLC*, 2014 WL 1284499, at *6 (citation and internal quotation marks omitted). "Although the standard to obtain jurisdictional discovery is low, courts will not permit discovery based only upon bare, attenuated, or unsupported assertions of personal jurisdiction or when a plaintiff's claim appears to be clearly frivolous." *Id.* (citation and internal quotation marks omitted). The Seventh Circuit has cautioned that "[f]oreign nationals usually should not be subjected to extensive discovery in order to determine whether personal jurisdiction over them exists." *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 946 (7th Cir. 2000).

In ruling on a motion to take jurisdictional discovery, the Court accepts as true the factual allegations relevant to jurisdiction made in Plaintiff's complaint and draws all reasonable

6

inferences in Plaintiff's favor.  *Cent. States, Se. & Sw. Area Pension Fund v. Phencorp Reinsurance Co., Inc.*, 440 F.3d 870, 878 (7th Cir. 2006).  However, to the extent that Defendant 5BY2 has submitted affidavits opposing jurisdiction or contradicting Plaintiff's allegations, Plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction.  *Pentwater*, 2016 WL 6476541, at *1 (citing *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003)).

A federal district court sitting in diversity must apply the personal jurisdiction rules of the state in which it sits.  *Kipp v. Ski Enterprise Corp. of Wisconsin, Inc.*, 783 F.3d 695, 697 (7th Cir. 2015).  Illinois is the relevant state in this case.  The governing statute in Illinois permits courts to exercise personal jurisdiction up to the limits of the Due Process Clause of the Fourteenth Amendment.  *Id.* (citing 735 ILCS 5/2-209(c)).  The Due Process Clause authorizes personal jurisdiction over out-of-state defendants when the defendant has "certain minimum contacts with [the state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* (citation and internal quotation marks omitted).

Courts recognize two types of personal jurisdiction: general and specific.  *Daimler AG v. Bauman,* 134 S. Ct. 746, 751 (2014).  Specific jurisdiction is case-specific, and the claim must be linked to the activities or contacts with the forum.  *Kipp*, 783 F.3d at 698.  General jurisdiction, on the other hand, is "all purpose" and exists only "when the [party's] affiliations with the State in which suit is brought are so constant and pervasive as to render it essentially at home in the forum State." *Id.* at 697–98 (citation and internal quotation marks omitted).

The Seventh Circuit has noted that in recent years the Supreme Court has raised the bar for general jurisdiction.  *Kipp*, 783 F.3d at 698.  "Because general jurisdiction exists even with respect to conduct entirely unrelated to the forum state, the Supreme Court has emphasized that it

should not lightly be found." *Id.* Instead, general jurisdiction exists only when the organization is "essentially at home" in the forum state. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). Thus far, the Supreme Court has identified only two places where that condition will be met: the state of the corporation's principal place of business and the state of its incorporation. *Kipp*, 783 F.3d at 698 (citing *Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014)). Any additional bases for general jurisdiction "would have to meet the stringent criteria laid out in *Goodyear* and *Daimler*," which "require more than the substantial, continuous, and systematic course of business that was once thought to suffice." *Kipp*, 783 F.3d at 698 (citation and internal quotation marks omitted). Courts can exercise general jurisdiction only when "the continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit * * * *on causes of action from dealings arising entirely distinctly from those activities*." *Id.* (quoting *Daimler*, 134 S. Ct. at 761) (emphasis in original). In other words, a foreign corporation's affiliation with the state must be "so continuous and systematic" as to render it essentially at home in the forum state. *Daimler*, 134 S. Ct. at 761. Additionally, general jurisdiction "calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide." *Id.* at 762 n.20.

### III. Analysis

Plaintiff makes two main arguments related to general jurisdiction. First, Plaintiff argues that 5BY2 should be subject to the Court's jurisdiction by virtue of its subsidiary 5BY2 US Inc.'s connections with the forum state because piercing the corporate veil is warranted. Second, Plaintiff argues that documentary evidence demonstrates that 5BY2 solicits business in Illinois, thus contradicting Koot's declaration that "5BY2 does not solicit business in Illinois, and has never done so." [19, Exhibit B, at ¶ 28.] The Court will address each argument in turn. The

Court also notes that Plaintiff does not argue that he should be permitted to take jurisdictional discovery as to specific jurisdiction, and thus this argument is waived. See *United Fin. Mortg. Corp. v. Bayshores Funding Corp.*, 245 F. Supp. 2d 884, 891 (N.D. Ill. 2002) (explaining that plaintiff had waived an argument for general jurisdiction where plaintiff did not develop an argument for general jurisdiction).

Plaintiff argues that "[b]ased on publicly available information, one can infer that 5BY2 and 5BY2 US Inc. do not observe corporate formalities," such that piercing the corporate veil is warranted and the Court should exercise jurisdiction over 5BY2 based on 5BY2 US Inc.'s connections with Illinois. [44, at 3.] Ordinarily, the jurisdictional contacts of a subsidiary corporation are not imputed to the parent corporation. *City of Greenville v. Syngenta Crop Pro., Inc.*, 830 F. Supp. 550, 555 (S.D. Ill. 2011). However, if a parent exercises "an unusually high degree of control" over the subsidiary or corporate formalities are not observed, a court may have personal jurisdiction over a parent based on the subsidiary's contacts. See *id.* Where a plaintiff claims a parent company is subject to a court's jurisdiction by virtue of its subsidiary's contacts, the court considers the following facts:

> (1) whether officers or directors are the same; (2) how much control is exerted by parent over daily affairs of its subsidiary; (3) whether parent arranges financing for and capitalization of subsidiary; (4) whether separate books, tax returns, and financial statements are kept; (5) whether parent holds its subsidiary out as agent; and (6) the method of payment made to parent by subsidiary.

*City of Greenville*, 830 F. Supp. 2d at 555. Plaintiff infers that 5BY2 and 5BY2 US Inc. do not observe corporate formalities because 5BY2 US Inc. does not have an independent website and instead shares a website with 5BY2, 5BY2's website provides the address of 5BY2 US's New York office, and 5BY2 and 5BY2 US Inc. share a brand logo. Plaintiff concedes, however, that he cannot establish that 5BY2 exercises a high degree of control over 5BY2 US Inc.

9

The Court is not convinced that Plaintiff has made a *prima facie* case of general jurisdiction based on piercing the corporate veil. First of all, the factors to which Plaintiff cites "bespeak a certain degree of integration between the two corporations," but "do not suggest a misuse of corporate form." *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 364 (7th Cir. 2016) (declining to pierce the corporate veil where parent and subsidiary shared similar names, shared directors, shared certain employees' services, used the same address on their tax returns, and shared a website); see also *Reimer*, 230 F.3d at 946 (holding that plaintiff was not entitled to take jurisdictional discovery where "[a]lmost all of [plaintiff's] evidence showed only that [defendants] were affiliated with [subsidiary], without any showing that the defendants exercised an unusually high degree of control over [subsidiary] or that corporate formalities were not substantially observed"); *Muniz v. Walgreen Co.*, 46 F. Supp. 3d 117, 124 (D.P.R. 2014) (declining to pierce the corporate veil despite plaintiff's allegations that the parent and subsidiary both "do business as Walgreens," share the same website, share common trademarks, logos, advertisements, marketing image and integrated sales systems, and shared a standard distribution protocol, and explaining that "[t]hese facts, without more, simply indicate that Walgreen Co. and Walgreen of San Patricio share a close branding relationship").

Additionally, Defendant 5BY2 has submitted evidence that 5BY2 and 5BY2 US Inc. do, in fact, observe corporate formalities. See *Pentwater*, 2016 WL 6476541, at *1 (explaining that to the extent that the defendant has submitted affidavits opposing jurisdiction or contradicting the plaintiff's allegations, the plaintiff "must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction"). Koot's "Declaration Regarding Jurisdictional Discovery" states that 5BY2 and 5BY2 US Inc. operate as separate business entities, keep separate books, file separate tax returns, and produce separate financial statements. [49, Exhibit

C, at ¶¶ 3, 10–12.] The companies also maintain separate and non-overlapping boards. [*Id.* at ¶ 9.] Although there is some overlap among the companies' officers, as Koot is President of both companies, the boards are otherwise separate. See *Bridge*, 815 F.3d at 365 (concluding that corporate formalities were observed and noting that "[t]hough board membership overlapped, the two boards were otherwise separate"). Thus, Plaintiff has not advanced "proof to a reasonable probability" of the facts necessary to establish personal jurisdiction based on piercing the corporate veil. *Pentwater*, 2016 WL 6476541, at *1 (citation and internal quotation marks omitted).

Next, Plaintiff argues that documentary evidence demonstrates that 5BY2 is involved with 5BY2 US Inc.'s solicitation of business in Illinois, thus contradicting Koot's statement that "5BY2 does not solicit business in Illinois, and has never done so." [19, Exhibit B, at ¶ 28.] In support of this argument, Plaintiff submits evidence that on August 21, 2015, an agent of 5BY2 or 5BY2 US Inc.[2] emailed a parking layout and estimate for property in Champaign, Illinois to a representative of CA Student Living Development and Management, LLC, which is an Illinois corporation with its principal office in Chicago, Illinois. [44, Exhibit D.] Plaintiff notes that Koot and Ian Todd, the CEO of 5BY2 US. Inc. at the time, were copied on the email. [See *id.*] Plaintiff further asserts that agents of 5BY2 participated in at least one conference call with representatives of CA Student Living to discuss "parking options for Champaign" and that Koot and Todd received a summary of the call. [44, Exhibit F.] Plaintiff also submits evidence that 5BY2 discussed with WRAP its goal of setting up regional parking services around the United States, including in Chicago, Illinois. [See 44, Exhibit G.] According to Plaintiff, "[s]uch facts

---

[2] Plaintiff states that it is unclear whether the author of the email is referring to 5BY2 or 5BY2 US Inc. [44, 4 n.1.]

indicate that 5BY2 might have personally availed itself of the Illinois market through its own actions and the actions of its subsidiary, 5BY2 US Inc."

Plaintiff argues that this evidence contradicts Koot's averment that 5BY2 does not solicit business in Illinois and has never done so and demonstrates that the factual record is "ambiguous or unclear" with respect to jurisdiction. In Plaintiff's view, this is enough to entitle him to jurisdictional discovery. In support of this argument, Plaintiff cites *Gilman Opco LLC v. Lanman Oil Company, Inc.*, in which the court granted in part the plaintiffs' motion for jurisdictional discovery after the plaintiffs submitted evidence calling into question statements in a declaration submitted by the president of the defendant corporation. 2014 WL 1284499, at *7 (N.D. Ill. Mar. 28, 2014). The court concluded that although the president did not necessarily lie in his declaration, the plaintiffs had put forth evidence sufficient to question some of the representations in the president's declaration regarding whether the defendant corporation conducted business in the forum state and whether the defendant corporation's sales in the forum state accounted for a percentage of its total sales. *Id.* Thus, the court permitted the plaintiffs to depose the president regarding the representations in his affidavits and the scope of the defendant corporation's business more generally. *Id.*

The Court is not convinced by Plaintiff's arguments. First of all, Plaintiff acknowledges that the documentary evidence he presents may concern business solicitations made by the subsidiary 5BY2 US Inc., and not solicitations made by the parent company, Defendant 5BY2. As explained above, the Court does not have personal jurisdiction over the parent company, Defendant 5BY2, based on its subsidiary's contacts with the forum state. The fact that Koot was copied on the emails and that agents of 5BY2 were on at least one conference call does not indicate that 5BY2 was soliciting business in Illinois. Cf. *Erie Foods Int'l v. Apollo Grp. &*

*Apollo USA, Inc.*, 2006 WL 932344, at *4 (N.D. Ill. Apr. 10, 2006) (noting that a parent company reviewing its subsidiary's business plans was an simply an "incident [ ] of a parent-subsidiary relationship"). Thus, the evidence supplied by Plaintiff may be perfectly consistent with Koot's declaration that 5BY2 does not solicit business in Illinois. Next, the evidence that 5BY2 discussed with WRAP its goal of setting up regional parking services in Chicago does not indicate that 5BY2 took any steps toward realizing this goal. Merely having a goal of doing business in the forum state falls far short of what is required to establish a *prima facie* case of general personal jurisdiction over the defendant. See *Daimler*, 134 S. Ct. at 761 (explaining that a foreign corporation's affiliation with the state must be "so continuous and systematic" as to render it essentially at home in the forum state)

Finally, and perhaps most importantly, even if the Court were to permit Plaintiff to depose Koot about 5BY2's solicitation of business in Illinois and Plaintiff were to prove that 5BY2 did solicit business in Illinois, this would not be enough to establish general personal jurisdiction over 5BY2. See *Kipp*, 783 F.3d at 699 (holding that the fact that defendant company does solicit business in Illinois was not enough to establish personal jurisdiction, and noting that "no case has ever held that solicitation alone is sufficient for general jurisdiction"). Further, even if Plaintiff could show that this solicitation to CA Student Living resulted in Defendant 5BY2 actually doing business in Illinois, this alone still would not be enough to establish general personal jurisdiction under the stringent standard set by *Goodyear,* 564 U.S. at 919, and *Daimler*, 134 S. Ct. at 762, especially when considering this one hypothetical transaction in the context of 5BY2's business activities in their entirety. See *Daimler*, 134 S. Ct. at 762 n.20 (noting that general jurisdiction "calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide"); *Kipp*, 783 F.3d at 699 (defendant Wisconsin company not subject

13

to general personal jurisdiction in Illinois even though defendant attended trade show in Illinois each year, maintained website accessible by Illinois residents, offered "Chicagoland Express" package, and has substantial percentage of its customers from Illinois, where website was mostly informative and did not allow purchase of tickets, "Chicagoland Express" package was not limited to Illinois residents, defendant had no Illinois office or employees, was not registered to do business in Illinois, and did not advertise in Illinois); *Pentwater*, 2016 WL 6476541, at *3 (denying Plaintiffs' motion to take jurisdictional discovery and explaining that "[e]ven assuming, as Plaintiffs seek discovery to establish, that Defendant has performed substantial additional transactional work for Illinois clients, has solicited or is soliciting business from Illinois clients, has sponsored and solicited clients to attend a [ ] seminar in Illinois, and represents a number of [ ] companies that are located in Illinois, these contacts would not bring the sum total of Defendant's Illinois activities to the level required to establish general jurisdiction"). In sum, because discovery into personal jurisdiction would be futile, the Court denies Plaintiff's motion to conduct jurisdictional discovery [43].

## IV. Conclusion

For the foregoing reasons, the Court denies Plaintiff's motion to conduct jurisdictional discovery [43]. Plaintiff is given until August 3, 2017 to file a response brief to Defendant 5BY2's motion to dismiss for lack of personal jurisdiction [19]; Defendant 5BY2 is given until August 17, 2017 to file a reply brief. The Court will issue a ruling by mail.

Date: July 13, 2017

_____
Robert M. Dow, Jr.
United States District Judge